UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

LORNA NURSE,

                    Plaintiff,

                                              **MEMORANDUM AND ORDER**

        -against-                             09-CV-5356(KAM)(RLM)

LUTHERAN MEDICAL CENTER,

                    Defendant.

--------------------------------------- X
**MATSUMOTO, United States District Judge:**

           Plaintiff Lorna Nurse ("Nurse" or "plaintiff"), a
former employee of defendant Lutheran Medical Center ("LMC" or
"defendant"), brought this action alleging that she was
terminated from her job as a Nurse Practitioner based on her
race (Black) and national origin (Barbadian), in violation of
Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.
§ 2000e *et seq.*  Presently before the court is defendant's
motion for summary judgment pursuant to Federal Rule of Civil
Procedure 56.  For the reasons set forth below, defendant's
motion is granted.

                          **BACKGROUND**

I.    **Facts**

           The following facts are undisputed unless otherwise
noted.  The court has considered whether the parties have
proffered admissible evidence in support of their positions and

has viewed the facts in the light most favorable to the non-moving plaintiff.

## A. Plaintiff's Employment with Lutheran Medical Center

Plaintiff is a Black woman who was born in Barbados, immigrated to the United States in 1975 at the age of 13, and thereafter naturalized. (ECF No. 26-8, Defendant's Statement of Uncontested Facts Pursuant to Rule 56.1 of the Local Civil Rules, dated 4/5/2011 ("DSOF") ¶ 1; ECF No. 27-7, Plaintiff's Response to Defendant's Statement of Uncontested Facts Pursuant to Local Rule 56.1, dated 5/5/2011 ("PSOF") ¶ 1; ECF No. 26, Affirmation of Roger H. Briton in Support of Defendant's Motion for Summary Judgment, Ex. 1, Deposition of Lorna Nurse, dated 7/27/2010 ("Nurse Dep.") at 37.)[1] In 1992, plaintiff commenced employment as a nurse for defendant LMC. (DSOF ¶ 3; PSOF ¶ 3; ECF No. 12, Amended Complaint, filed 6/30/2010 ("Compl.") ¶ 7.) LMC is a health care system consisting of various medical facilities and programs, including a School Health Program. (DSOF ¶ 6; PSOF ¶ 6.) In 1996, plaintiff applied for and obtained a transfer to LMC's School Health Program as a Nurse Practitioner ("NP") at P.S. 10. (DSOF ¶ 4; PSOF ¶ 4.) As an

---

[1] Although plaintiff's Response to Defendant's Statement of Uncontested Facts Pursuant to Local Rule 56.1 and plaintiff's Counterstatement of Material Facts in Dispute are submitted as one document, with Plaintiff's Counterstatement beginning on page 34 of Plaintiff's Statement of Uncontested Facts, the court will cite to them herein as separate documents. (*See* ECF No. 27-7, Plaintiff's Response to Defendant's Statement of Uncontested Facts Pursuant to Local Rule 56.1, dated 5/5/2011 ("PSOF"); ECF No. 27-7, Plaintiff's Counterstatement of Material Facts in Dispute, dated 5/5/2011 ("PCOF").)

NP, plaintiff's duties were, *inter alia*, to care for and examine students at P.S. 10, interact with school administrators, students, and their families, and supervise the Medical Assistant ("MA") assigned to P.S. 10. (DSOF ¶¶ 9-10, 12; PSOF ¶¶ 9-10, 12.) The MA's duties included preparing patients for the NP to examine, administering first aid, scheduling examinations, bookkeeping, and contacting students and their families. (DSOF ¶ 11; PSOF ¶ 11.) Although MAs were represented by a union, NPs were not. (DSOF ¶ 13; PSOF ¶ 13; ECF No. 26-11, Affidavit of Patricia Schwimer in Support of Defendant's Motion for Summary Judgment Pursuant to Rule 56.1, dated 3/30/2011 ("Schwimer Aff.") ¶ 8; ECF No. 28-2, Reply Affidavit of Fred Jordan in Support of Defendant's Motion for Summary Judgment Pursuant to Rule 56.1, dated 5/20/2011 ("Jordan Reply Aff.") ¶ 4.) From September 2003 to February 2005, the MA assigned to P.S. 10 was Daisy Garcia. (DSOF ¶¶ 39, 83; PSOF ¶¶ 39, 83.)

As an NP at P.S. 10, plaintiff reported directly to two NP Co-Coordinators: Patricia Schwimer, a Caucasian woman, and Sharon Daisley, an African-American woman. (DSOF ¶¶ 14, 16; PSOF ¶¶ 14, 16.) Ms. Schwimer had more direct supervision over NPs, including plaintiff, and Ms. Daisley had more direct supervision over MAs. (PSOF ¶ 17; ECF No. 27, Affirmation of Robert J. Valli in Opposition to Defendant's Motion for Summary

3

Judgment, Ex. C, Deposition of Sharon Daisley, dated 11/12/2010 ("Daisley Dep.") at 15.)  Ms. Schwimer and Ms. Daisley reported to Joan Burns, an African-American woman, who served as Director of Operations for, *inter alia*, the School Health Program.  (DSOF ¶ 18; PSOF ¶ 18.)  Fred Jordan, an African-American man, was the Director of Human Resources at LMC and was responsible for providing human resources assistance to the School Health Program.  (DSOF ¶ 20; PSOF ¶ 20.)  At all relevant times, the physician assigned to oversee medical care at P.S. 10 was Dr. Karen Modeste, a Black woman from Trinidad.  (DSOF ¶ 15; PSOF ¶ 15.)  In addition, the Principal at P.S. 10 was Concetta Ritorto and the Assistant Principal was Laura Scott.  (DSOF ¶ 86; PSOF ¶ 85; ECF No. 26, Affirmation of Roger H. Briton in Support of Defendant's Motion for Summary Judgment, Ex. 3, Plaintiff's Exhibit ("PX") 3 at LMC000280; ECF No. 26, Affirmation of Roger H. Briton in Support of Defendant's Motion for Summary Judgment, Ex. 2, Defendant's Exhibit ("DX") 27.)

Between October 1997 and 2004, Ms. Schwimer prepared periodic performance appraisals in which plaintiff routinely received an overall rating of "superior" or "exceeds expectations."  (DSOF ¶ 46; PSOF ¶ 46; DX 8-12.)

B.  **Lutheran Medical Center's Progressive Discipline Policies**

At all times relevant to the instant action, LMC had a

published anti-discrimination policy and procedures. (DSOF ¶ 31; PSOF ¶ 31; DX 3.) In addition, LMC's "Human Resources Policies and Procedures" (the "Policies") prescribed the rules of conduct and guidelines for taking corrective action with employees. (PCOF ¶ 14; PX 2 at LMC000669.) The Policies "generally" provided for progressive discipline, pursuant to which "[r]eprimands should normally be issued" in the following order: (i) oral counselings; (ii) first written warning notice; (iii) follow-up warning notices; (iv) suspension/discharge. (PCOF ¶ 18; PX 2 at LMC000673-74.) The Policies further provided that "[g]enerally, no action involving suspension without pay (or discharge) should be taken with an employee who has not first received a written warning." (DSOF ¶ 128; PSOF ¶ 128; PCOF ¶ 22; PX 2 at LMC000674.)

Nevertheless, the Policies set forth a non-exhaustive list of infractions for which discharge without prior warnings was permitted, including but not limited to insubordination, behavior which endangers employee or patient welfare, and fighting. (DSOF ¶ 128; PSOF ¶ 128; PCOF ¶ 22; PX 2 at LMC000674.) Further, at the end of the Policies was a chart listing 30 types of infractions and the corresponding recommended disciplinary action. (PCOF ¶¶ 23-29; PX 2 at LMC000676.) For example, the recommended action was suspension or discharge for "[a]ny harassing conduct in the workplace"

(number 21), "[r]efusal to follow instructions of supervisors including refusal to accept legitimate job assignment" (number 23), and "[i]mmoral, indecent or disorderly conduct of any nature" (number 24). (PCOF ¶¶ 27-29; PX 2 at LMC000676-77.) The Policies also stated that "there may be other circumstances which require immediate suspension or discharge." (PX 2 at LMC000674.)

The Policies provided that "*neither suspension nor dismissal* can be administered without *prior* review of the recommended action with the Vice President Human Resources or his/her designee." (PSOF ¶ 128; PCOF ¶ 16; PX 2 at LMC000669 (emphasis in original in bold).)

### C.   Incidents Involving Plaintiff

#### i.   January 20, 2005 Incident with Daisy Garcia

On January 20, 2005, plaintiff wrote to Ms. Schwimer complaining that her MA, Ms. Garcia, had disregarded plaintiff's instructions in connection with scheduling an appointment for a child. (DSOF ¶ 47; PSOF at ¶ 47; DX 16.) On January 24, 2005, Ms. Garcia sent Ms. Daisley a memorandum outlining her view of the interpersonal and other problems between plaintiff and Ms. Garcia. (DSOF ¶ 52; PSOF ¶ 52; ECF No. 26-10, Affidavit of Sharon Daisley in Support of Defendant's Motion for Summary Judgment Pursuant to Rule 56.1, dated 3/30/2011 ("Daisley Aff.") ¶ 4; DX 17.) On February 1, 2005, plaintiff attended a meeting

with Ms. Schwimer, Ms. Daisley, and Dr. Modeste. (DSOF ¶ 54; PSOF ¶ 54.) Although plaintiff initially believed the meeting had been called so she could voice her concerns regarding Ms. Garcia's work performance, instead the discussion focused on how plaintiff communicated with and treated her MAs. (DSOF ¶ 54; PSOF ¶ 54.) At the conclusion of the meeting, which lasted 45 minutes to an hour, plaintiff was instructed to "go back and talk to [Ms. Garcia]." (DSOF ¶ 54; PSOF ¶ 54.) However, plaintiff did not follow up with Ms. Garcia. (DSOF ¶ 55; PSOF ¶ 55.)

### ii. February 4, 2005 Incident with Daisy Garcia

On February 4, 2005, another incident occurred between plaintiff and Ms. Garcia regarding a telephone call that Ms. Garcia placed to a student's parent. (DSOF ¶ 56; PSOF ¶ 56.) Both plaintiff and Ms. Garcia wrote to Ms. Schwimer, Ms. Daisley, and others relaying their version of the events. (DSOF ¶¶ 56, 65; PSOF ¶¶ 56, 65; DX 18, 19, 23.)

According to plaintiff, the situation arose when Ms. Garcia failed to give a parent a complete telephone message from plaintiff while plaintiff was with a student. (DSOF ¶ 56; PSOF ¶ 56; DX 18, 23.) When plaintiff asked Ms. Garcia to relay the entire message, Ms. Garcia told plaintiff to relax and accused plaintiff of being racist. (DSOF ¶ 56; PSOF ¶ 56; DX 18.) According to plaintiff, Ms. Garcia was angry, but plaintiff was

not.  (DSOF ¶ 59; PSOF ¶ 59.)  Plaintiff reported that Ms.
Garcia then handed her the wrong chart, and plaintiff "tossed"
the chart toward Ms. Garcia's empty chair.  (DSOF ¶ 60; PSOF
¶ 60.)  Plaintiff asserted that the chart started to slide, they
both reached for it, and Ms. Garcia got to it first.  (PSOF
¶ 60; Nurse Dep. at 154.)  Plaintiff reported that she then
picked up the phone, which was lying on Ms. Garcia's desk, and
she briefly spoke to the parent.  (DSOF ¶ 62; PSOF ¶ 62.)
According to plaintiff, Ms. Garcia was no longer in the room
when plaintiff spoke to the parent.  (DSOF ¶ 62; PSOF ¶ 62.)

          Immediately after the incident, Ms. Garcia called Ms.
Daisley and recounted her own version of the incident, including
that plaintiff had been physically aggressive toward her.  (DSOF
¶ 64; Daisley Aff. ¶ 5.)  In a memorandum dated February 7, 2005
to Mr. Jordan, Ms. Schwimer, Ms. Daisley, Ms. Burns, and others,
Ms. Garcia wrote that plaintiff had spoken to her in a "very
hostile and threatening manner," then "abruptly" come out of
plaintiff's office "very angry," and "proceeded to grab [the
phone] from [Ms. Garcia] almost hitting [Ms. Garcia's] face with
the telephone."  (DSOF ¶ 66; PSOF ¶ 66; DX 19.)  Ms. Garcia
further reported that plaintiff had "abusively poked her finger
twice" at charts that Ms. Garcia was holding against her chest.
(DSOF ¶ 66; PSOF ¶ 66; DX 19.)  Ms. Garcia reported that she had
become "very upset and nervous," that plaintiff had "placed

[her] in a very hostile, threatening, abusive, irrational environment which is not safe and unproductive to work in," and that she had needed to see her physician "because of the stress [she] was under due to this incident," consequently missing work. (DSOF ¶ 66; PSOF ¶ 66; DX 19.)

Upon receiving plaintiff's and Ms. Garcia's conflicting accounts of the February 4 incident, including Ms. Garcia's report of physical aggression, Ms. Schwimer and Ms. Daisley consulted with Mr. Jordan and Ms. Burns to determine the appropriate next steps. (DSOF ¶ 67; Schwimer Aff. ¶ 19.) Mr. Jordan instructed Ms. Schwimer to refer plaintiff and Ms. Garcia to LMC's Occupational Health Department ("Occupational Health") for an evaluation of their fitness to work; Ms. Burns agreed with this course of action. (DSOF ¶ 68; ECF No. 26-9, Affidavit of Fred Jordan in Support of Defendant's Motion for Summary Judgment Pursuant to Rule 56.1, dated 3/29/2011 ("Jordan Aff.") ¶ 7.)

On February 9, 2005, plaintiff met with Ms. Schwimer and Ms. Daisley, and was shown a written complaint from Ms. Garcia, questioned about the incident, and referred to Occupational Health for an evaluation. (DSOF ¶ 69; PSOF ¶ 69.) At the conclusion of the February 9 meeting, plaintiff was directed not to report for work and understood she was "on suspension" with pay for three days pending her appointment with

Occupational Health.  (DSOF ¶ 70; PSOF ¶ 70; Nurse Dep. at 175-78.)  On February 10, 2005, plaintiff met with an Occupational Health physician's assistant who asked her some questions about the February 4 incident and referred her to an LMC psychologist, Dr. Marc Rand.  (DSOF ¶ 71; PSOF ¶ 71.)  Plaintiff was subsequently allowed to return to work pending her appointment with Dr. Rand.  (DSOF ¶ 72; PSOF ¶ 72; Nurse Dep. at 175-78.)

On February 11, 2005, plaintiff wrote to Ms. Burns, with copies to Mr. Jordan and Ms. Schwimer, setting forth her version of the February 4 incident and denying any physical contact with Ms. Garcia.  (DSOF ¶ 74; PSOF ¶ 74; DX 23.)  In a letter dated February 17, 2005, Ms. Schwimer gave plaintiff feedback on her letter, requesting that she correct some typographical and punctuation errors and resubmit the letter.  (DSOF ¶ 74; PSOF ¶ 74; DX 24.)  Ms. Schwimer's letter acknowledged that plaintiff was "attempting to present [her] case in a situation of potential serious disciplinary action, action that may cost one or both parties their job."  (DX 24.)  Plaintiff corrected the typographical errors and resubmitted the letter on February 18, 2011.  (DSOF ¶ 74; PSOF ¶ 74; DX 23.)

Although plaintiff was scheduled for an evaluation by Dr. Rand on February 22, 2005, she cancelled the appointment without providing an explanation.  (DSOF ¶ 77; PSOF ¶ 77.)  Plaintiff later explained that she sought advice as to whether

it was legal for her employer to subject her to a psychological evaluation. (DSOF ¶ 78; PSOF ¶¶ 77-78.) On March 2, 2005, plaintiff was evaluated by Dr. Rand. (DSOF ¶ 79; PSOF ¶ 79.) He told her that he thought she "needed a little bit" of "anger management classes," but cleared her to return to work. (DSOF ¶¶ 80-81; PSOF ¶¶ 80-81; DX 26.) Plaintiff was not disciplined in the aftermath of the February 4, 2005 incident. (DSOF ¶ 84; PSOF ¶ 84.)

Ms. Schwimer advised plaintiff that Ms. Garcia was in the process of being evaluated by a psychologist and that Ms. Garcia was deciding whether to file a charge against plaintiff because plaintiff was accused of hitting Ms. Garcia. (DSOF ¶ 76; PSOF ¶ 76; Nurse Dep. at 187-88.) Subsequently, plaintiff was advised that Ms. Garcia had declined to file a charge. (DSOF ¶ 76; PSOF ¶ 76; Nurse Dep. at 187-88.)

Ms. Garcia was evaluated by a psychologist and was also cleared to return to work.[2] (*See* DSOF ¶¶ 76, 82; PSOF ¶¶ 76, 82.) Ms. Garcia was subsequently reassigned to a different school, and plaintiff no longer worked with her. (DSOF ¶ 83; PSOF ¶ 83.)

---

[2] During her deposition, Ms. Schwimer testified that instead of electing the employees' assistance program through the union, Ms. Garcia "elected a private psychologist that was approved by occupational health." (Schwimer Dep. at 63.) Ms. Schwimer's affidavit states that Ms. Garcia was evaluated by "a psychologist designated by her union." (Schwimer Aff. ¶ 21.)

### iii. April 12, 2005 Incident with a Parent, the Principal, and Patricia Schwimer

Between April 8 and April 12, 2005, an incident occurred between plaintiff and a student's parent. (DSOF ¶ 86; PSOF ¶¶ 94-95; DX 27.) On April 8, the parent called plaintiff and angrily demanded to know why her son had been brought to plaintiff's office by another child. (DSOF ¶ 94; PSOF ¶ 94; Nurse Dep. at 215-16.) After plaintiff tried to reason with the parent, plaintiff hung up the telephone while the parent was still speaking. (DSOF ¶¶ 88, 94; PSOF ¶ 94; Nurse Dep. at 216-17.)

In a memorandum to Ms. Schwimer dated April 12, 2005, Concetta Ritorto, the Principal of P.S. 10, reported that the parents had "demanded to see the principal" and complained to her that plaintiff had been "[r]ude, had [an] attitude and spoke with disrespect" over the telephone. (DSOF ¶ 88; PSOF ¶ 88; DX 27.) Ms. Ritorto also reported that the parents were concerned that the student had told his parents — and subsequently told the Principal and the Assistant Principal, Laura Scott — that plaintiff had asked the student whether his "mom was good or bad" and that he was "afraid" and "nervous." (DSOF ¶ 88; PSOF ¶ 88; DX 27.)

On April 12, 2005, Ms. Ritorto and Ms. Scott held a meeting with plaintiff and the parent in an attempt to mediate

their dispute.  (DSOF ¶¶ 89, 95; PSOF ¶¶ 89, 95; DX 27.)  During
the meeting, the parent accused plaintiff of asking her son
whether his mother was good or bad and violating her son's
rights.  (DSOF ¶¶ 89; PSOF ¶ 95; DX 27; Nurse Dep. at 219.)  It
is undisputed that plaintiff then asked the parent, "are you
serious, lady?"  (DSOF ¶¶ 89, 95; PSOF ¶¶ 89, 95.)

Following plaintiff's question, according to Ms.
Ritorto, the parent and plaintiff proceeded to "speak over each
other and the communication broke down."  (DSOF ¶ 89; PSOF ¶ 89;
DX 27.)  Plaintiff admits that when the parent interrupted her,
she told the parent to "be quiet."  (DSOF ¶ 96; PSOF ¶ 96; Nurse
Dep. at 220.)  Ms. Ritorto further reported to Ms. Schwimer that
when she "felt the conversation could not be brought to a
resolution," she asked plaintiff to leave the room.  (DSOF ¶ 89;
PSOF ¶ 89; DX 27.)  According to Ms. Ritorto, she asked
plaintiff to leave three times before plaintiff finally left.
(DSOF ¶ 89; PSOF ¶ 89; DX 27.)  Ms. Ritorto reported that she
requested that plaintiff leave because she felt the conversation
could not be resolved, the parent needed to be calmed, and that
because plaintiff was a professional, "she would understand that
this was the best course of action for the moment."  (DSOF ¶ 89;
PSOF ¶ 89; DX 27.)

Plaintiff, on the other hand, acknowledges being
"upset" and "angry," but denies arguing with or talking over the

parent during the April 12, 2005 meeting.  (DSOF ¶¶ 97, 99; PSOF ¶¶ 97, 99.)  According to plaintiff, the parent yelled at her and threatened her with bodily harm.  (DSOF ¶ 96; PSOF ¶ 96; Nurse Dep. at 219-20.)  Plaintiff denies that Ms. Ritorto ever asked her to leave the room.  (DSOF ¶ 98; PSOF ¶ 98.)  Rather, plaintiff states that Ms. Ritorto interrupted her and told her that the meeting was over, so plaintiff left.  (DSOF ¶ 98; PSOF ¶ 98.)

Ms. Ritorto and Ms. Scott then spoke with the child, who was brought into the room and stated, *inter alia*, that "[t]he nurse asked [me] questions if my mom was good or bad. . . . I was afraid."  (DX 27 at 2.)

After the meeting, Ms. Ritorto and Ms. Scott spoke to plaintiff and "mentioned the word lady."  (DSOF ¶ 99; PSOF ¶ 99.)  Plaintiff told them "that the word lady is not an insult" and that she felt they had not treated her and the parent the same during the meeting.  (DSOF ¶ 99; PSOF ¶ 99; DX 27; Nurse Dep. at 223.)

Later in the afternoon on April 12, Ms. Schwimer called plaintiff to discuss the incident.  (DSOF ¶ 100; PSOF ¶ 100.)  According to plaintiff, Ms. Schwimer questioned her "over and over and over" and told plaintiff that the word "lady" was a "slur and demeaning" and insisted that "there was a problem with [plaintiff's] tone of voice."  (DSOF ¶¶ 101-02;

PSOF ¶¶ 101-02.)  Plaintiff denied having done anything wrong,
and explained that the term "lady" was not an insult, but rather
was a term from Barbados signifying respect.  (PSOF ¶¶ 95, 99;
DSOF ¶¶ 99, 102; Nurse Dep. at 223, 226-27, 258.)  It is
undisputed that during the telephone call, plaintiff told Ms.
Schwimer that "she wasn't going to answer any more questions,
and that she was going to end the phone call" and that plaintiff
then hung up the telephone.  (DSOF ¶¶ 101, 103; PSOF ¶¶ 101,
103; Nurse Dep. at 226-28.)

### D.  Plaintiff's Termination

On April 13, 2005, Ms. Schwimer emailed Mr. Jordan
about the incident involving the parent and Ms. Ritorto, as well
as Ms. Schwimer's subsequent telephone call with plaintiff.
(DSOF ¶ 106; PSOF ¶ 106; DX 28.)  In her email, Ms. Schwimer
stated her view that "this warrants two separate write-ups as
there is an incident of unprofessional behavior and a second
incident of possible insubordination to a supervisor."  (DSOF
¶ 106; PSOF ¶ 106; DX 28.)  After receiving Ms. Schwimer's
email, Mr. Jordan discussed the situation with Ms. Burns, and
they decided to discharge plaintiff.  (PSOF ¶¶ 108-09; Jordan
Aff. ¶¶ 10-11; Daisley Dep. at 55; ECF No. 27, Affirmation of
Robert J. Valli in Opposition to Defendant's Motion for Summary
Judgment, Ex. B, Deposition of Patricia Schwimer, dated
11/11/2010 ("Schwimer Dep.") at 63, 68-69.)

On April 14, 2005, Mr. Jordan and Ms. Burns informed Ms. Schwimer of their decision, and asked her to draft a termination letter and schedule a meeting with plaintiff the next day. (PSOF ¶ 110; Jordan Aff. ¶ 12; Schwimer Aff. ¶ 29.) Ms. Schwimer called plaintiff and told her to attend a meeting the next day, April 15, at 12:30 p.m. (DSOF ¶ 111; PSOF ¶ 111.) On April 15, 2005, however, plaintiff advised Ms. Schwimer that she would not attend the meeting because she had to take care of something urgent. (DSOF ¶ 112; PSOF ¶ 112; DX 30.) Plaintiff later told Ms. Schwimer that she wanted to have a lawyer present for the meeting, and requested that the meeting be rescheduled to April 21, 2005. (DSOF ¶ 114; PSOF ¶ 114.) On April 18, 2005, Ms. Daisley told plaintiff that the meeting would proceed on April 19, and that her lawyer could not attend. (DSOF ¶ 115; PSOF ¶ 115.) Plaintiff subsequently called Ms. Burns, who also told plaintiff "that it was not the kind of meeting that an attorney could be present at [sic]." (DSOF ¶ 115; PSOF ¶ 115.)

During a brief meeting on April 19, 2005 attended by plaintiff, Ms. Schwimer, Ms. Daisley, and Larry McReynolds, Executive Director of the Family Health Centers, plaintiff was informed that her employment was terminated, effective immediately. (DSOF ¶ 116; PSOF ¶ 116; DX 32.) Ms. Schwimer gave plaintiff a letter of termination, which stated, in relevant part:

16

> There have been serious actions, past and
> present, involving inappropriate
> communication with staff that you supervise
> or with whom you collaborate.  This
> escalated 2/9/05 when allegations of anger
> and intra office aggression were made;
> concluding 4/12/05 when complaints were made
> by the administrators at PS 10 regarding
> your inappropriate actions at a meeting and
> your refusal to respond to the
> administrator's directives to restore order.
>
> Ongoing counseling and advice have been
> offered by your direct supervisors Sharon
> Daisley and myself. A phone conversation
> with me on 4/12/05 for the purpose of
> exploring current complaints was ended
> abruptly when you hung up the phone.

(DX 32; DSOF ¶ 116; PSOF ¶ 116.)

On July 7, 2005, plaintiff filed charges of discrimination with the New York City Commission on Human Rights ("NYCCHR"), alleging discrimination based on her race and national origin.  (DSOF ¶ 130; PSOF ¶ 130; Compl. ¶ 6; DX 35.) On April 15, 2009, the NYCCHR dismissed plaintiff's complaint, finding that there was no probable cause to believe that she had been discriminated against.  (DSOF ¶ 131; PSOF ¶ 131; DX 44.) Plaintiff's request for review was denied on August 12, 2009. (DX 46.)  Plaintiff cross-filed her Verified Complaint with the Equal Employment Opportunity Commission, which issued her a Notice of Right to Sue on September 25, 2009.  (Compl. ¶ 6.) The instant action was filed on December 7, 2009.

**DISCUSSION**

**I.    Standard of Review**

    **A.    Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "A fact is material if it might affect the outcome of the suit under the governing law."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citing *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citing *Roe,* 542 F.3d at 35).  Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must construe the facts in the light most favorable to the nonmoving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Id.* Nevertheless, the nonmoving party may not rest merely on allegations or denials but must instead set forth specific facts showing a genuine issue for trial. *See id.* ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (citations omitted). Such facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## B. Title VII Employment Discrimination Claims

Pursuant to Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). The

court analyzes Title VII discrimination claims under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g.*, *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010) (assessing plaintiff's Title VII claims for race and national origin discrimination under the framework set forth in *McDonnell Douglas*). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008); *Ruiz*, 609 F.3d at 491-92. The burden of establishing a *prima facie* case is not onerous. *Tex. Dep't of Comt'y Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Indeed, the Second Circuit has characterized the burden as "minimal." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to offer a "legitimate non-discriminatory reason" for the termination. *Ruiz*, 609 F.3d at 492 (citing *Holcomb*, 521 F.3d at 140). This "burden is one of production, not persuasion . . . and involves no credibility assessment of the evidence." *Pathare v. Klein*, No. 06-CV-2202,

20

2008 U.S. Dist. LEXIS 69119, at *12 (S.D.N.Y. Sept. 12, 2008) (citations omitted), *aff'd*, 347 F. App'x 646 (2d Cir. Sept. 30, 2009).

If the defendant satisfies its burden, the plaintiff must present evidence to demonstrate that the defendant's asserted reason is mere pretext for an impermissible discriminatory motive. *Holcomb*, 521 F.3d at 141. In the summary judgment context, this means that the plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging [the plaintiff] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994) (emphasis in original).

The Second Circuit has cautioned that summary judgment is often inappropriate in cases where the trier of fact will have to delve into an employer's intent because intent is an issue as to which direct evidence is rarely available. *See, e.g., id.* at 1224; *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). Nevertheless, when an employer has explained its conduct and the plaintiff has offered only conclusory assertions in opposition, summary judgment may be granted. *See, e.g., Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.

1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

## II. Application

### A. Plaintiff has failed to establish a *prima facie* case of discrimination based on her race or national origin.

Plaintiff alleges that she was terminated from her position at LMC as a Nurse Practitioner because she is Black and a native of Barbados. (Compl. ¶ 41; ECF No. 27-8, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 1.) LMC does not dispute that plaintiff has met the first three prongs of her *prima facie* case: plaintiff is a Black Barbadian, she was qualified for her position as a Nurse Practitioner, and her termination constituted an adverse employment action. (ECF No. 26-7, Defendant's Memorandum of Law in Support of Motion for Summary Judgment, dated 4/5/2011 ("Def. Mem.") at 5.) LMC contends, however, that summary judgment is warranted because plaintiff cannot show that her termination occurred under circumstances that give rise to an inference of discrimination. (*Id.*)

The court thus considers the fourth factor, whether the circumstances of plaintiff's termination give rise to an inference or race or national origin discrimination.

Plaintiff's undisputed testimony is that other than a comment by

her subordinate, Ms. Garcia, on February 4, 2005, that plaintiff

treated people differently based on the color of their skin, no

one made any comments to plaintiff about her race or any

inappropriate comments about her national origin.[3] (DSOF ¶ 117;

PSOF ¶ 117; DX 18.) Instead, plaintiff alleges an inference of

discrimination based on three grounds: (i) disparate treatment

of other similarly situated employees; (ii) comments made by Ms.

Schwimer; and (iii) failure to use progressive discipline before

terminating her employment. (Pl. Mem. at 21-26.) Drawing all

inferences in plaintiff's favor, the court finds that plaintiff

has not established an inference of discrimination.

---

[3] Insofar as plaintiff seeks to argue that an inference of discrimination can
be found in Ms. Garcia's alleged statement to plaintiff on February 4, 2005
that plaintiff was racist, plaintiff's argument fails. To the extent
plaintiff suggests that Ms. Garcia's comment shows that Ms. Garcia
discriminated against plaintiff on the basis of her race, it has no bearing
on whether plaintiff's adverse employment action was based on discrimination.
While "impermissible bias of a single individual . . . may taint the ultimate
employment decision . . . even absent evidence of illegitimate bias on the
part of the ultimate decision maker," the plaintiff must show that "the
individual shown to have the impermissible bias played a meaningful role in
the . . . process." *Vahos v. General Motors Corp.*, No. 06-CV-6783, 2008 U.S.
Dist. LEXIS 47971, at *19 (E.D.N.Y. June 16, 2008) (quoting *Back v. Hastings
on Hudson Union Free School Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004)).
Here, plaintiff has not made any allegation that Ms. Garcia played any role
in the ultimate decision to terminate plaintiff's employment. On the
contrary, plaintiff was Ms. Garcia's supervisor, and Ms. Garcia had been
transferred from P.S. 10 prior to plaintiff's termination. Further, to the
extent plaintiff suggests that Ms. Garcia's comment, as reported by plaintiff
to Ms. Schwimer and Ms. Daisley (DX 18), put the notion of race into the
minds of the individuals who did decide to terminate plaintiff's employment,
the court finds that to draw such an inference "would require a finder of
fact to engage in wholesale — and wholly impermissible — speculation."
*Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 535 (S.D.N.Y.
2011). Accordingly, the court finds that no inference of discrimination may
be drawn from Ms. Garcia's alleged statement that plaintiff was racist.

### i.    Disparate Treatment

Plaintiff argues that other non-Black, non-Barbadian employees were treated more favorably than she was, raising an inference of discrimination.  (Pl. Mem. at 23-26.)

To prove that LMC subjected plaintiff to disparate treatment, "that is, treated [her] less favorably than a similarly situated employee outside [her] protected group," plaintiff must show that she "was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted); *see also Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects." (citation omitted)).  Employees are considered similarly situated if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct."  *Graham*, 230 F.3d at 40; *accord Finn v. N.Y. State Office of Mental Health*, No. 08-CV-5142, 2011 U.S. Dist. LEXIS 115950, at *40 (S.D.N.Y. Oct. 6, 2011) ("The court determines whether plaintiff and the asserted comparators are similar in significant respects by considering whether the respective individuals were subject to the same performance evaluation and disciplinary standards and engaged in conduct of

comparable seriousness without any differentiating circumstances." (citing *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001)). The facts and circumstances of plaintiff's and the comparators' cases need not be identical, but there should be a reasonably close resemblance. *Graham*, 230 F.3d at 40.

Whether employees are similarly situated is "[o]rdinarily . . . a question of fact for the jury." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Nevertheless, if there are many distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *Harlen Assocs. v. Inc. Vill. of Minneola*, 273 F.3d at 499 n.2 2d Cir. 2001) ("[T]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

Plaintiff identifies six non-Black, non-Barbadian employees who she alleges were similarly situated to her and received more favorable treatment: Hispanic MAs Elizabeth Rivera, Luz Acosta, Daisy Garcia, and Migdalia Chevere, and Caucasian NPs Mary Parker and Martha Anderson. (Pl. Mem. at 3-8, 24-26.) On the factual record presented in this case, however, the court finds that plaintiff has failed to meet her

burden of showing that she and any of these individuals were similarly situated.

### a.  Elizabeth Rivera

Plaintiff first identifies Elizabeth Rivera, a Hispanic woman who was an MA at P.S. 10 for a period prior to and until approximately June 1998.  (DSOF ¶¶ 23, 26; PSOF ¶¶ 23, 26; PCOF ¶ 36.)  It is undisputed that Ms. Rivera's behavior was the subject of several complaints.  (DSOF ¶¶ 24-25; PSOF ¶¶ 24-25; PCOF ¶¶ 37-39; DX 5, 6.)  In particular, in a memorandum dated January 12, 1998, the Mental Health Supervisor at the School Health Program complained that Ms. Rivera had acted in an "inappropriate way" by yelling at another employee in a "loud and angry manner" in the presence of students, parents, and plaintiff.  (PCOF ¶¶ 40-42; DX 5.)  Rather than being discharged for her behavior, Ms. Rivera requested and was granted a transfer to another school, where she continued to have "difficulties related to [her] performance."  (PCOF ¶¶ 45-46; DSOF ¶ 26; PSOF ¶ 26; DX 6.)

As an initial matter, plaintiff cannot be considered similarly situated to any of the MAs because MAs were not subject to the same performance evaluation and disciplinary standards as plaintiff was.  It is undisputed that plaintiff's job as an NP included supervising the MAs assigned to the school and that supervision of MAs was not part of an MA's job.  (DSOF

¶¶ 9-12; PSOF ¶¶ 9-12.) It is also undisputed that NPs were considered professionals and were held to a somewhat higher standard than the MAs who were supervised by the NP. (Schwimer Dep. at 46.) Further, MAs were represented by a union, a fact which imposed contractual limitations on LMC's ability to impose discipline on them. (DSOF ¶ 13; PSOF ¶ 13; Schwimer Aff. ¶ 8; Jordan Reply Aff. ¶ 4.) Accordingly, plaintiff has failed to show that she and Ms. Rivera and other MAs were similarly situated. *See, e.g.*, *Renaud v. Fed. Express Corp.*, No. 10-CV-4261, 2012 U.S. Dist. LEXIS 1452, at *21-22 (E.D.N.Y. Jan. 6, 2012) (finding that where comparator's job did not include the same supervisory responsibilities, had different performance standards, and the individuals were terminated for infractions of different degrees of seriousness, they were not similarly situated); *see also Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 840 (2d Cir. 1996) (noting that "[r]equiring higher-ups to conform to a higher standard of decency is not contrary to established law and does conform with common sense").

Further, although it is undisputed that Ms. Rivera was the subject of several written and oral complaints about her performance, plaintiff has identified only a single documented incident in which Ms. Rivera was accused of yelling in front of students and family members. (*See* PCOF ¶¶ 40-42; DX 5.) Plaintiff, by contrast, was reportedly involved in a series of

incidents between February 2005 and April 2005 involving allegations of unprofessional conduct toward a co-worker, a parent, school administrators, and her supervisor. (*See* Jordan Aff. ¶ 11; Jordan Reply Aff. ¶ 3.) Thus, a reasonable jury could not find that plaintiff and Ms. Rivera were similarly situated.

### b. Luz Acosta

Luz Acosta, a Hispanic MA who worked at P.S. 10 from 2001 to 2003 (DSOF ¶ 31), also cannot be considered similarly situated to plaintiff because they were not subject to the same performance and disciplinary standards. Further, plaintiff identifies only her own complaints that Ms. Acosta performed poorly at work and had a "problem with her attitude" to suggest that they were similarly situated. (*See* DSOF ¶ 33; PSOF ¶ 33; Nurse Dep. at 66-67.) Viewed objectively, however, such complaints are clearly different from, and less serious than, the allegations that plaintiff physically assaulted Ms. Garcia, hung up on a parent and Ms. Schwimer, and engaged in additional behavior perceived by the Principal to be unprofessional and disruptive.

### c. Daisy Garcia

Daisy Garcia was a Hispanic MA at P.S. 10 from September 2003 through February 2005. (DSOF ¶¶ 39, 83; PSOF ¶¶ 39, 83; PCOF ¶ 7.) According to plaintiff, Ms. Garcia's work

performance was problematic in that she failed to schedule students for appointments, misplaced or lost records, failed to keep adequate records, and spent too much time on the telephone during working hours. (DSOF ¶ 40; PSOF ¶ 40; PCOF ¶¶ 7, 9.)

As described above, on February 4, 2005, the parties agree that plaintiff and Ms. Garcia were involved in a dispute regarding whether Ms. Garcia had adequately relayed a message to a parent. (DSOF ¶ 56; PSOF ¶ 56.) Ms. Garcia complained to administrators that plaintiff responded to her in a "very hostile and threatening manner," nearly hit her face with a telephone, and twice poked her fingers into charts against Ms. Garcia's chest. (DSOF ¶ 66; PSOF ¶ 66; DX 19.) Plaintiff initially complained that Ms. Garcia failed to follow instructions and called plaintiff a racist (DSOF ¶ 56; PSOF ¶ 56; DX 18), and also denied Ms. Garcia's accusations. (DSOF ¶ 74; PSOF ¶ 74; DX 23.) Both plaintiff and Ms. Garcia were required to undergo psychological evaluations to determine their fitness to return to work. (DSOF ¶¶ 68, 76, 79, 82; PSOF ¶¶ 76, 79, 82; Jordan Aff. ¶ 7.) Ms. Garcia was not terminated for her behavior, but was reassigned to a different school. (DSOF ¶ 83; PSOF ¶ 83.)

Contrary to plaintiff's arguments, she and Ms. Garcia cannot be considered similarly situated based on the undisputed facts in the record. Although Ms. Garcia was the subject of

numerous complaints about her work performance as an MA (DX 16, 18, 23; PCOF ¶ 3), at no time was Ms. Garcia accused of physical aggression or hanging up on a parent and her supervisor, like plaintiff was. Moreover, although plaintiff accused Ms. Garcia of failing to follow instructions and calling plaintiff racist, LMC required both employees to obtain psychological clearance before returning to work and neither of them was subject to discipline at that time. Further, unlike plaintiff, who was discharged after a series of additional incidents shortly after the conflict with Ms. Garcia, plaintiff has offered no evidence that Ms. Garcia had any subsequent performance or behavioral problems.

Plaintiff's assertion that Ms. Garcia was treated differently because plaintiff was required to see an Occupational Health psychologist while Ms. Garcia was permitted to see another psychologist — either a psychologist designated by her union or one approved by Occupational Health (Pl. Mem. at 25; PSOF ¶ 82) — is not sufficient to support an inference of discrimination because, as noted, plaintiff and Ms. Garcia were not similarly situated in the material respect that plaintiff was an NP and Ms. Garcia was an MA.

### d. Migdalia Chevere

Next, plaintiff argues that LMC's treatment of Migdalia Chevere, a Hispanic MA, gives rise to an inference of

discrimination because Ms. Chevere was given oral and written warnings, pursuant to LMC's progressive discipline policy, for the serious infraction of inappropriately supervising her own children on site after hours. (Pl. Mem. at 26; *see* PCOF ¶¶ 51-52; Schwimer Dep. at 22-25.) Even if Ms. Chevere had been subject to the same standards and her infraction could be considered of comparable seriousness as plaintiff's, the fact remains that Ms. Chevere was charged with a single, isolated incident of misconduct, as compared to plaintiff, whose alleged misconduct occurred on several occasions over the course of a few months, during which time plaintiff met on several occasions to discuss issues with supervisors. Thus, LMC's use of progressive steps to discipline Ms. Chevere does not give rise to an inference of discrimination against plaintiff.

### e. Martha Anderson

Plaintiff also points to Martha Anderson, a Caucasian NP who received a written warning pursuant to LMC's progressive discipline policies when she discharged a child from the school without notifying a parent or the school administration. (PCOF ¶¶ 48, 50; Schwimer Dep. at 25-26; Daisley Dep. at 61.) Although it is undisputed that Ms. Anderson's conduct endangered the welfare of a child, an infraction for which the Policies reserve the discretion to suspend or discharge the employee without prior written notice (PCOF ¶¶ 48, 49; Schwimer Dep. at

86-87; Daisley Dep. at 61; PX 2 at LMC000674), Ms. Anderson's
isolated incident of misconduct is not comparable to the series
of allegations against plaintiff of aggressive and
unprofessional behavior over the course of three months.  This
difference in the facts and circumstances of their cases
precludes a finding that plaintiff and Ms. Anderson were
similarly situated.

### f.    Mary Parker

Finally, plaintiff appears to argue that she was
treated differently from Mary Parker, a Caucasian NP who
supervised Daisy Garcia at another school and had numerous
conflicts with Ms. Garcia.  (DSOF ¶ 39; PSOF ¶ 39; PCOF ¶¶ 3-4).
In particular, plaintiff notes that Ms. Schwimer never doubted
Ms. Parker when her views conflicted with Ms. Garcia's, and Ms.
Parker was never subjected to a psychological evaluation.  (Pl.
Mem. at 5, 24-25; PCOF ¶ 5.)  However, because plaintiff has
neither asserted nor provided any evidence to suggest that Ms.
Parker ever engaged in any alleged misconduct, Ms. Parker cannot
be considered similarly situated to plaintiff.

### g.    Additional Claims of Disparate Treatment

Plaintiff also alleges generally that she was treated
differently due to her race and national origin in that no other
NPs were required to undergo a psychological examination.  (Pl.
Mem. at 25, 28; DSOF ¶ 120; PSOF ¶¶ 119-20; Nurse Dep. at 205-

06, 254, 256.)  During her deposition, plaintiff explained that
while it was routine practice for MAs, most of whom were
Hispanic, to be sent for evaluation by a physician's assistant
when they had problems with their NPs, plaintiff was the only
person who was required to undergo a psychological evaluation
and referred for anger management classes.  (Nurse Dep. at 205-
06.)

      Plaintiff's assertions nevertheless fail to raise an
inference of discrimination because she has not identified any
similarly situated employees who were subject to the same
standards as plaintiff and engaged in conduct of comparable
seriousness and yet were not subject to psychological
evaluations.  On the contrary, plaintiff admitted that, to her
knowledge, no other NPs had been accused, rightly or wrongly, of
nearly hitting or otherwise touching an MA or acting in a manner
that an MA described as "hostile," "threatening," "abusive," or
causing an MA to complain that the NP made her feel "nervous,"
"stressed," and "upset."  (Nurse Dep. at 208-09; DX 19.)
Further, it is undisputed that plaintiff did not identify any
other NPs who hung up the telephone on a parent and their
supervisor.  (DSOF ¶ 119; PSOF ¶ 119.)  Plaintiff's failure to
identify any similarly situated individuals who were treated
more favorably is fatal to her claim.  *See, e.g.*, *Desir v. Bd.
of Coop. Educ. Servs.*, 803 F. Supp. 2d 168, 180 (E.D.N.Y. 2011)

("Though Plaintiff generally contends that similarly situated individuals outside his protected class were treated more favorably than he, Plaintiff has provided no detail about these employees, and thus cannot establish that they were similarly situated."); see also Hines v. Hillside Children's Ctr., 73 F. Supp. 2d 308, 318 (W.D.N.Y. 1999) ("To establish disparate treatment, the plaintiff must show membership in a protected class and that a similarly situated nonprotected person was treated differently . . . . [F]or evidence relating to other employees to be relevant, those employees must be similarly situated to plaintiff.").

Further, far from supporting an inference of discrimination, LMC's treatment of Ms. Garcia and plaintiff in the aftermath of the February 4, 2005 incident supports the absence of discrimination. It is undisputed that LMC sent both plaintiff and Ms. Garcia to psychologists to determine their fitness to return to work. (DSOF ¶¶ 76, 79, 82; PSOF ¶¶ 76, 79, 82.) Although plaintiff alleges that discrimination can be inferred from the fact that Ms. Garcia was not required to see the Occupational Health psychologist, it is undisputed that Ms. Garcia was subject to different standards than plaintiff, including that she was represented by a union while plaintiff was not. (DSOF ¶¶ 9-13; PSOF ¶¶ 9-13; Schwimer Dep. at 46; Schwimer Aff. ¶ 8; Jordan Reply Aff. ¶ 4.) Accordingly, because

no reasonable jury could find plaintiff and Ms. Garcia similarly situated, the mere difference in the psychologists they saw does support an inference of discrimination.

ii. **Comments by Patricia Schwimer**

Plaintiff argues that an inference of discrimination based on her national origin may be inferred from the fact that Ms. Schwimer reprimanded plaintiff for using the term "lady" during the meeting with a student's parent on April 12, 2005. (Pl. Mem. at 26.)  According to plaintiff, Ms. Schwimer told plaintiff that the term "lady" was a "slur and demeaning." (DSOF ¶¶ 101-02; PSOF ¶¶ 101-02.)  Plaintiff asserts that "lady" is a cultural term from Barbados commonly used to signify respect, and that Ms. Schwimer's comments "not only reflect an inability to understand Nurse's cultural differences but evince a native origin bias, clearly supporting an inference of discrimination."  (Pl. Mem. at 26; DSOF ¶ 123; PSOF ¶ 123.)

In light of the undisputed facts of the case, the court finds that Ms. Schwimer's admonishment of plaintiff is insufficient to raise an inference of discriminatory animus.  It is undisputed that during a meeting in the Principal's office with an angry parent, plaintiff asked the parent, "are you serious, lady?"  (DSOF ¶ 95; PSOF ¶ 95.)  After plaintiff made this comment, the parent became enraged, began to yell, and, according to plaintiff, threatened plaintiff with bodily harm.

(DSOF ¶¶ 89, 96; PSOF ¶¶ 89, 96.)  As reported by the Principal
to Ms. Schwimer, after plaintiff's comment, "Ms. Nurse and [the
parent] began to speak over each other and the communication
broke down."  (DX 27.)

Plaintiff has not alleged that Ms. Schwimer said
anything about plaintiff's national origin or made any
connection between the word "lady" and Barbados.  (DSOF ¶ 117;
PSOF ¶ 117; DX 18.)  *Cf. Abdu-Brisson v. Delta Air Lines, Inc.*,
239 F.3d 456, 468 (2d Cir. 2001) (noting that an inference of
discrimination can be found where "the employer [] critici[zed]
. . . the plaintiff's performance in ethnically degrading terms"
or made "invidious comments about others in the employee's
protected group.").  Nor is there any evidence that the phrase
"are you serious, lady?" or the way plaintiff said it is unique
to Barbados.  The connection plaintiff seeks to draw between her
supervisor's reaction to plaintiff's use of the word "lady" and
her national origin is far too attenuated to infer
discriminatory animus.  *See, e.g.*, *Govori v. Goat Fifty, LLC*,
No. 10 Civ. 8982, 2012 U.S. Dist. LEXIS 15842, at *19 (S.D.N.Y.
Feb. 8, 2012) (finding employer's comment that plaintiff "had
chosen a different path" to be too ambiguous to constitute
evidence of intentional gender discrimination based on
plaintiff's decision to begin IVF treatments because that phrase
was not a "common reference to motherhood or pregnancy or

reasonably understood as one"). In this context, the court finds that no rational trier of fact could conclude that admonishing plaintiff for saying, "are you serious, lady?", a statement that was perceived by a parent and an administrator as unprofessional and argumentative, was based on the plaintiff's national origin or the cultural significance of the term "lady."

### iii. Failure to Use Progressive Discipline

Plaintiff argues that LMC's decision to discharge her despite the absence of progressive discipline creates an inference of discriminatory intent. (Pl. Mem. at 15-17, 21-23.)

It is well settled that "'[d]epartures from procedural regularity' can create an inference of discriminatory intent, sufficient to establish a *prima facie* case" of employment discrimination. *Foss v. Coca Cola Enters., Inc.*, No. 07-CV-1322, 2011 U.S. Dist. LEXIS 34945, at *24 (E.D.N.Y. Mar. 31, 2011) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997)); *see also Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) ("Departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision."). In *Foss*, for example, the district court found that the employer's failure to follow its own progressive discipline policy constituted circumstantial evidence that satisfied the

plaintiff's *prima facie* case.   2011 U.S. Dist. LEXIS 34945, at
*24-25.

Here, LMC had a progressive discipline policy, which
escalated from oral counseling to a written warning and,
eventually, to suspension or termination.  (PCOF ¶ 18; PX 2 at
LMC000673-74.)  Nevertheless, as LMC correctly points out, the
Policies reserved the discretion to immediately suspend or
discharge an employee without prior warnings where circumstances
require, provided such termination was "approved in advance by
the Vice President Human Resources and his/her designee."  (*See*
Def. Mem. at 10; ECF No. 28-3, Defendant's Reply Memorandum of
Law in Support of Motion for Summary Judgment, dated 5/20/2011
("Def. Reply") at 5; PX 2 at LMC000674-75.)

It is undisputed that over an approximately three-
month period, plaintiff was involved in numerous incidents in
which her behavior was called into question and that she and her
supervisors met to discuss issues regarding plaintiff's
interactions with others.  It is further undisputed that on
April 8, 2005, plaintiff hung up the telephone on a student's
parent while the parent was still speaking.  (DSOF ¶¶ 88, 94;
PSOF ¶ 94.)  It is also undisputed that after a meeting with
plaintiff, the parent, the Principal, and the Vice Principal on
April 12, 2005, the Principal reported that plaintiff had made
the parent very angry and had refused to leave the room when

repeatedly asked to do so.  (DSOF ¶¶ 88-89; PSOF ¶¶ 88-89; DX 27.)  The Principal further reported that a student had said after a meeting with plaintiff that plaintiff's questioning made him feel "afraid."  (*Id.*)  Moreover, it is undisputed that during a telephone call on April 12, 2005, plaintiff refused to answer Ms. Schwimer's questions and ended the call with her supervisor.  (DSOF ¶¶ 101, 103; PSOF ¶¶ 101, 103.)  Finally, it is undisputed that Human Resources reviewed, participated in, and ultimately made the final decision to terminate plaintiff's employment.  (PSOF ¶¶ 108-09; Jordan Aff. ¶¶ 10-11; Daisley Dep. at 55; Schwimer Dep. at 63, 68-69.)

Plaintiff has failed to present any evidence that her termination constituted a departure from LMC's Policies, which explicitly permitted immediate termination, with the approval of Human Resources, where circumstances require.  Accordingly, plaintiff has failed to satisfy the fourth prong of her *prima facie* case, and summary judgment in favor of defendant is warranted.  *See Renaud*, 2012 U.S. Dist. LEXIS 1452, at *26 (granting summary judgment where plaintiff failed to come forward with affirmative evidence that defendant discriminated against plaintiff or departed from permissible disciplinary procedures).

**B. Defendant has established a legitimate nondiscriminatory reason for terminating plaintiff's employment.**

Although plaintiff's failure to satisfy the fourth element of a *prima facie* case is fatal to her claim, even if she had met her minimal burden of establishing a *prima facie* case, LMC has provided a legitimate, nondiscriminatory reason for plaintiff's termination.

According to the termination letter provided to plaintiff on April 19, 2005, LMC terminated plaintiff because of "serious actions, past and present, involving inappropriate communication with staff that [she] supervise[d] or with whom [she] collaborate[d]." (DX 32.) In particular, plaintiff was alleged to have engaged in intra office aggression on February 9, 2005, inappropriate behavior at a meeting with a parent and school administrators on April 12, 2005, and hanging up on her supervisor on April 12, 2005. (*Id.*) Such a "pattern of unprofessional conduct" (Jordan Aff. ¶ 11), as reported by co-workers, school administrators, and a parent, is a legitimate justification for termination. *See, e.g.*, *Thermidor v. Beth Israel Med. Ctr.*, 683 F. Supp. 403, 412 (S.D.N.Y. 1988) ("It is widely acknowledged that reasons such as low productivity and conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge."); *McHenry v. One Beacon Ins. Co.*, No. 03-CV-4916, 2005 U.S. Dist.

LEXIS 46573, at *18 (E.D.N.Y. Aug. 29, 2005) (finding plaintiff's "pattern of conduct reported by both co-workers in plaintiff's department and outsiders, coupled with the fact that [plaintiff's] behavior did not change even after formal warnings" to be a legitimate justification for terminating her employment); *Papasmiris v. Dist. 20 of the N.Y. City Dep't of Educ.*, 299 F. App'x 97, 98 (2d Cir. 2008) (affirming district court's decision granting summary judgment to defendants where the evidence of legitimate termination included letters from parents complaining that plaintiff had behaved inappropriately on a school trip and evaluations by a school principal citing multiple instances of misconduct by plaintiff).

C. **Plaintiff has failed to establish that defendant's reason for terminating her employment is a pretext for discrimination.**

Because LMC has articulated a legitimate, nondiscriminatory reason for terminating plaintiff's employment, the burden shifts back to plaintiff to prove that the stated reason was a pretext for discrimination. *Ruiz*, 609 F.3d at 492. At this stage, the question becomes whether the evidence, taken as a whole and viewed in the light most favorable to plaintiff, would permit "a rational finder of fact [to] conclude that the adverse action taken against [plaintiff] was more likely than not a product of discriminatory animus." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir. 2009). Indeed, a defendant's

stated neutral reason for an employment action "cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1933) (emphasis in original).

The court may consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000)). In addition, on a summary judgment motion, plaintiff must "come forward with at least some credible evidence that the actions of [defendant] were motivated by racial animus or ill-will." *Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002).

In an effort to defeat summary judgment, plaintiff asserts that her termination was based on false and unproven allegations of wrongdoing. In particular, plaintiff maintains that she was never physically aggressive toward Ms. Garcia, noting as support the fact that plaintiff was cleared to return to work without being disciplined for the incident. (Pl. Mem. at 22-23.) Plaintiff also denies the Principal's allegation that she asked plaintiff to leave the meeting with the parent

three times before plaintiff actually left.  (DSOF ¶ 98; PSOF ¶ 90, 98; Nurse Tr. at 221-22.)  In addition, plaintiff argues that she did not abruptly hang up on Ms. Schwimer, insisting that she informed Ms. Schwimer that she was going to end the telephone call and told Ms. Schwimer to have a good evening before hanging up.  (Pl. Mem. at 23; PSOF ¶¶ 101, 119.)  Plaintiff further asserts that, in any event, hanging up the telephone is not grounds for termination.  (PSOF ¶ 119.)

Plaintiff first appears to argue that her termination was not warranted under LMC's Policies because she had not engaged in any misconduct that rose to the level of "circumstances . . . requir[ing] immediate suspension or discharge" contemplated by the Policies.  (PX 2 at LMC000674; see Pl. Mem. at 22-23.)  To survive on a motion for summary judgment, however, plaintiff must come forward with some evidence that LMC's purported failure to follow its Policies was due to unlawful discrimination, not merely that LMC's decision was unfair or unjustified.  Indeed, while "departures from procedural regularity" such as failing to follow progressive discipline may create an inference of discriminatory intent, *Foss*, 2011 U.S. Dist. LEXIS 34945, at *24, "a violation of an employer's internal personnel practices is not, by itself, an act of discrimination," *Albury v. J.P. Morgan Chase*, No. 03 Civ. 2007, 2005 U.S. Dist. LEXIS 5363, at *27-28 (S.D.N.Y. Mar. 31,

2005) (citations omitted).  Here, even if the court were to find that LMC departed from its Policies, plaintiff's failure to present any evidence that any such departure was due to unlawful discrimination is fatal to her claim.  *See, e.g.*, *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 98 (2d Cir. 1999) (affirming district court's decision granting defendant judgment as a matter of law "because [plaintiff] produced no evidence that [defendant's] reasons, even if pretextual, served as pretext for age discrimination"); *Davis v. Peake*, No. 08 Civ. 3570, 2011 U.S. Dist. LEXIS 107380, at *23-24 (S.D.N.Y. Sept. 20, 2011) ("While Plaintiff seems to argue that Defendant's alleged departure from procedures is indicative of pretext, a plaintiff must still produce evidence that defendant's reason, 'even if pretextual' was a pretext for discrimination." (quoting *Norville*, 196 F.3d at 98)); *McHenry*, 2005 U.S. Dist. LEXIS 46573, at *21 (finding that "the fact that defendants failed to follow standard disciplinary procedures in ultimately discharging plaintiff does not support a claim of gender discrimination" where, among other things, "plaintiff fails to indicate how defendants' actions were gender-based").

Moreover, plaintiff's assertion that her termination was based on false and unproven allegations is insufficient to establish that LMC's reasons for dismissing her were pretextual. "It is well settled that the mere fact that an employee

44

disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008); *see also Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) (noting that "evidence that the decision was . . . based on a faulty investigation," without more, would be insufficient to establish pretext); *McHenry*, 2005 U.S. Dist. LEXIS 46573, at *19 ("A plaintiff's mere denial of responsibility for the incidents giving rise to termination, without more, is insufficient to defeat summary judgment." (citing *Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 745-47 (S.D.N.Y. 1996)); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination . . . were false or a pretext for discrimination.")).

Even assuming for the purposes of the instant motion that plaintiff engaged in no misconduct whatsoever, plaintiff does not dispute that several incidents occurred in which her behavior was perceived and reported by others as unprofessional and insubordinate. Further, the undisputed evidence shows that

45

Mr. Jordan and Ms. Burns, the individuals who made the decision
to discharge plaintiff, were presented with numerous reports and
complaints that plaintiff had engaged in "unprofessional conduct
towards a co-worker, school administration, a parent and her
supervisor." (Jordan Aff. ¶ 11.)  Moreover, plaintiff has
presented no evidence to rebut the sworn statements of Mr.
Jordan that he believed the reports of unprofessional conduct
and terminated plaintiff based on that belief, not on the basis
of her race or national origin.  (Jordan Aff. ¶¶ 7, 10, 13;
Jordan Reply Aff. ¶ 3.)  *See, e.g.*, *Agugliaro*, 927 F. Supp. at
747 (holding that even assuming allegations against plaintiff
were false, summary judgment was nevertheless appropriate
because the decisionmaker believed the allegations in good faith
and fired plaintiff on that basis, not on the basis of
plaintiff's age, gender, or pension status).  Accordingly,
because plaintiff has not pointed to admissible evidence that
would permit a rational trier of fact to conclude that her
termination was more likely than not motivated by unlawful
discriminatory animus based on her race and national origin, LMC
is entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, defendant LMC's motion for summary judgment is granted in its entirety. The Clerk of the Court is respectfully requested to enter judgment in favor of defendant and to close the case.


**SO ORDERED.**
Dated: February 27, 2012
      Brooklyn, New York


_____    /s/_____ _____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York